# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 4, 2026

Lyle W. Cayce
Clerk

No. 25-20524

Geoffrey Polk,

*Plaintiff—Appellant*,

*versus*

Amanda Crawford, *In her Official Capacity as the Texas Insurance Commissioner*,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:25-CV-2652

Before Willett, Engelhardt, and Douglas, *Circuit Judges*.
Don R. Willett, *Circuit Judge*:

Texas will license an escrow officer who lives in Aztec, New Mexico—nearly 280 miles from the Texas border. It will not license one who lives in Elkhart, Kansas—barely forty miles. Why? New Mexico shares a border with Texas and Kansas does not. Article IV requires more than geographic happenstance.

Geoffrey Polk lives in Illinois. He is licensed to practice law in at least forty jurisdictions, including Texas, and holds title-producer licenses in twenty-four States. Texas concedes that he satisfies every requirement for an

No. 25-20524

escrow-officer license but one: his home address. On that basis alone, the Texas Department of Insurance denied his application.

Polk sued under Article IV's Privileges and Immunities Clause and the Fourteenth Amendment's Equal Protection Clause, then sought a preliminary injunction. The district court denied relief without deciding whether the law was likely constitutional, reasoning that it would be "precipitous to overturn a 60-year-old statute on a preliminary basis."

But a preliminary injunction does not finally "overturn" a statute. It temporarily restrains enforcement while the court decides whether the statute may lawfully be enforced at all. Nor do constitutional defects cure with age. Longevity is not legitimacy.

On this record, Polk is likely to prevail. Article IV protects the right to pursue a common calling on equal terms. Once Polk showed that Texas facially discriminates against citizens of nonadjacent States in access to such a calling, Texas bore the burden of justifying the line it drew. It offered none.

Because Polk's exclusion inflicts injuries that cannot be remedied by damages, and because a narrow injunction serves the equities and the public interest, we REVERSE and REMAND with instructions to ENTER a preliminary injunction.[1]

## I. Background

Polk is a legal resident of Florida but currently lives in Illinois. He is an attorney licensed in at least forty jurisdictions, Texas among them. On April 1, 2025, he applied for a Texas escrow-officer license. The Department denied his application the next day because he did not live "in the State of Texas or any state next to Texas." A follow-up letter repeated that he was

---

[1] We resolve the appeal on Article IV and do not reach the Equal Protection claim.

No. 25-20524

"neither a resident of Texas, nor a resident of a state adjacent to this state," and therefore did "not qualify for an escrow officer license" under Texas law.[2] The State does not dispute that Polk satisfies every other requirement.

Two months later, Polk filed this suit, alleging that the residency rule violates the Privileges and Immunities Clause of Article IV and the Equal Protection Clause of the Fourteenth Amendment. The State moved to dismiss under Rule 12(b)(6) on August 8, 2025.[3] Polk responded four days later.

That same day, Polk moved for a preliminary injunction to "halt the ongoing enforcement of unconstitutional residency requirements for Texas Escrow Officer Licenses." His supporting affidavit averred that the rule (1) prevented him from serving his existing Texas-based clients, (2) prevented prospective clients from hiring him, and (3) hindered his "ability to expand and maintain relationships with national and regional clients who require title and escrow services in multiple jurisdictions, including Texas."

At an October 28, 2025, hearing on both motions, the State offered no evidence supporting the regional residency requirement. After argument, the district court orally denied both Polk's motion for a preliminary injunction and the State's motion to dismiss.

The court's minute order gave three reasons for denying preliminary relief. First, it "noted that it would be precipitous to overturn a 60-year-old statute on a preliminary basis." Second, it inferred little irreparable harm given Polk's failure to seek preliminary injunctions in similar suits elsewhere.

_____

[2] *See* Tex. Ins. Code §§ 2652.051(c)(1), 2652.056(1).

[3] *See* Fed. R. Civ. P. 12(b)(6).

No. 25-20524

Third, it found the merits "unclear" because of the "present record and lack of factual clarity." Polk timely appealed.[4]

## II. Preliminary Injunction Factors

We review the denial of a preliminary injunction for abuse of discretion.[5] A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[6] We review the district court's legal conclusions *de novo* and its factual findings for clear error.[7] An order "grounded in erroneous legal principles" likewise gets *de novo* review.[8]

### A. Likelihood of Success on the Merits

Polk invokes Article IV's Privileges and Immunities Clause and the Fourteenth Amendment's Equal Protection Clause. The State disputes both and, at the threshold, contests standing. We begin there, then turn to Article IV. Because likely success on that claim supports all the preliminary relief Polk seeks, we do not reach equal protection.

#### 1. Standing

We begin, as we must, with standing.[9] At the preliminary-injunction stage, a "plaintiff must make a 'clear showing' that she is 'likely' to establish

---

[4] *See* 28 U.S.C. § 1292(a)(1) (authorizing appellate jurisdiction of appeals from interlocutory orders denying injunctions).

[5] *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 288 (5th Cir. 2012).

[6] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[7] *Opulent Life Church*, 697 F.3d at 288.

[8] *Id.*

[9] *Est. of Parker v. Miss. Dep't of Pub. Safety*, 140 F.4th 226, 235 (5th Cir. 2025).

4

each element of standing."[10] Those elements are injury in fact, traceability, and redressability.[11] "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice."[12] Polk did more here: he supplied a sworn affidavit describing the injury caused by the challenged rule.

Polk identifies two concrete injuries. First, Texas denied him equal access to a licensed market solely because he lives outside Texas and its neighboring States. Second, he alleges resulting losses of clients, transactions, revenue, goodwill, and competitive standing. Traceability and redressability are straightforward: the Commissioner enforces the rule, and an injunction would eliminate the only ground for denial the Department identified.

The State meaningfully contests only injury.[13] It points to a provision allowing a Texas-licensed attorney to perform certain defined "duties of an escrow officer" without holding an escrow license.[14] Because Polk may close transactions and sign checks through an IOLTA account, the State says, the denial of a license causes no cognizable harm.

We disagree. Section 2652.003 permits attorneys to perform four defined "duties of an escrow officer"[15]—countersigning title insurance

---

[10] *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter*, 555 U.S. at 22).

[11] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

[12] *Id.* at 561.

[13] The State nominally frames this argument as one about traceability, but it is really an argument about injury. Its premise is not that some third party caused Polk's alleged harm; it is that Polk suffers no harm because, as a licensed attorney, he may already perform certain escrow-related functions without an escrow-officer license.

[14] Tex. Ins. Code § 2652.003(a).

[15] *Id.*

forms, supervising the forms' preparation and delivery, signing escrow checks, and closing transactions[16]—without a license. But it does not confer the full legal status or market access of a licensed escrow officer. Without a license, Polk cannot accept appointment from a title insurance agent,[17] employ licensed escrow officers under his own license,[18] or conduct business in the name of a title insurance company or agent.[19] The State thus answers a different question. Polk does not claim that Texas forbids him from every escrow-related act; he claims that Texas denied him the licensed status and opportunities it affords identically qualified residents of Texas and adjacent States. In equal-treatment cases, the injury is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."[20] The same principle applies here: the barrier is an injury in its own right. Polk also alleges financial harm, which separately establishes an Article III injury.[21]

2. Privileges and Immunities Clause

Article IV commands that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."[22] This provision "was designed 'to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting

---

[16] Tex. Ins. Code § 2501.003(4).

[17] Tex. Ins. Code § 2652.1511(a).

[18] Tex. Ins. Code § 2652.003(b).

[19] Tex. Ins. Code § 2652.003(c).

[20] *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

[21] *See Texas v. United States*, 787 F.3d 733, 748 (5th Cir. 2015) ("It is well established that a financial loss generally constitutes an injury.").

[22] U.S. Const. art. IV, § 2, cl. 1.

from citizenship in those States are concerned.'"[23] For this analysis, citizenship and residency are essentially interchangeable.[24]

The inquiry is twofold. First, we ask whether the activity at issue is "sufficiently basic to the livelihood of the Nation" to fall within the Clause.[25] If so, the restriction survives only if it is "closely related to the advancement of a substantial state interest."[26]

### a. Escrow Work Is a Protected Common Calling

"[T]he pursuit of a common calling is one of the most fundamental of those privileges protected by the Clause."[27] The Clause therefore sharply limits "a State's power to bias employment opportunities in favor of its own residents."[28] The Supreme Court has accordingly invalidated "state discrimination against nonresidents seeking to ply their trade, practice their occupation, or pursue a common calling within the State."[29] The Clause has been held to protect many different callings: lawyers,[30] merchants,[31]

---

[23] *Supreme Ct. of Va. v. Friedman*, 487 U.S. 59, 64 (1988) (quoting *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 180 (1869)); *see also* U.S. Const. amend. XIV, § 1 ("All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States *and of the State wherein they reside*." (emphasis added)).

[24] *See Friedman*, 487 U.S. at 64 ("While the Privileges and Immunities Clause cites the term 'Citizens,' for analytic purposes citizenship and residency are essentially interchangeable.").

[25] *Id.* (quoting *United Bldg. & Constr. Trades Council of Camden Cnty. & Vicinity v. Mayor of City of Camden*, 465 U.S. 208, 221–22 (1984)) (internal quotation marks omitted).

[26] *Friedman*, 487 U.S. at 65.

[27] *United Bldg. & Constr. Trades Council*, 465 U.S. at 219.

[28] *Hicklin v. Orbeck*, 437 U.S. 518, 525 (1978).

[29] *Id.* at 524.

[30] *Supreme Ct. of N.H. v. Piper*, 470 U.S. 274, 281 (1985).

[31] *Ward v. Maryland*, 79 U.S. (12 Wall.) 418, 430 (1870).

construction workers,[32] oil and gas pipeline workers,[33] and commercial fishermen,[34] among others.

Neither the Supreme Court nor our court has addressed escrow officers specifically. But the governing question is whether the occupation "is sufficiently basic to the national economy to be deemed a privilege protected by the Clause."[35] Other circuits have accordingly extended Article IV's protection to insurance professionals. The First Circuit, for example, held that insurance consulting falls within the Clause, expressing "no doubt that insurance and occupations in the insurance industry are important to the national economy,"[36] and the Ninth Circuit has reached the same conclusion for insurance agents.[37]

The State responds that escrow officers handle "purely *intrastate* transactions involving real estate—an area of traditional state authority." It thus would limit Article IV to occupations with an "interstate impact." That argument mistakes Article IV for Article I. The Clause does not ask whether each transaction constitutes interstate commerce. It asks whether a State may close a common calling to citizens of other States. The question is not whether the deed or dollars cross a border. It is whether the State erects one.

---

[32] *United Bldg. & Constr. Trades Council*, 465 U.S. at 221–22.

[33] *Hicklin*, 437 U.S. at 524–25.

[34] *Mullaney v. Anderson*, 342 U.S. 415, 417–18 (1952).

[35] *Friedman*, 487 U.S. at 66. We note, however, that the Supreme Court has not limited the Clause's protections to economic rights. *See Piper*, 470 U.S. at 281 n.11 ("The Court has never held that the Privileges and Immunities Clause protects only economic interests.").

[36] *Silver v. Garcia*, 760 F.2d 33, 36 (1st Cir. 1985).

[37] *See Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 934 (9th Cir. 2008).

No. 25-20524

Supreme Court precedent confirms the point. *Supreme Court of New Hampshire v. Piper* protected the legal profession *as a whole*, not merely the subset of legal matters crossing state lines, because it is "important to the national economy."[38] *Hicklin v. Orbeck* protected workers "connected with the extraction of Alaska's oil and gas,"[39] even though natural-resource production is both local and a traditional field of state authority.[40] *United Building & Construction Trades Council* protected construction workers simply because "[t]he opportunity to seek employment . . . is sufficiently basic to the livelihood of the Nation."[41] And *Toomer v. Witsell* framed the right as doing business in State B on terms of substantial equality with State B's citizens.[42] None of those decisions asked whether the particular lawsuit, wellhead, jobsite, or catch crossed a state line. Each looked to the calling. On the State's theory, Texas could exclude nonresident surgeons, engineers, and accountants whenever their work occurred wholly within Texas.[43] The State neither defends that consequence nor supplies a limiting principle.

The historical understanding points the same way. While riding circuit, JUSTICE WASHINGTON in *Corfield v. Coryell* listed "the right to

---

[38] 470 U.S. at 281.

[39] 437 U.S. at 530.

[40] *See Atl. Richfield Co. v. Christian*, 590 U.S. 1, 36 (2020) (GORSUCH, J., concurring in part and dissenting in part) (noting that "the regulation of real property and the protection of natural resources is a traditional and central responsibility of state governments").

[41] 465 U.S. at 221–22 (quoting *Baldwin v. Mont. Fish & Game Comm'n*, 436 U.S. 371, 388 (1978)) (cleaned up).

[42] 334 U.S. 385, 396 (1948).

[43] We do not decide whether any particular occupation would be protected. The point is that the State's transaction-by-transaction theory supplies no limiting principle: it would permit exclusion whenever a profession's work is performed wholly within Texas.

acquire and possess property of every kind" in his famous list of "those privileges and immunities which are, in their nature, fundamental" and "belong, of right, to the citizens of all free governments."[44] The historical understanding also included access to another State's courts.[45] Neither right depends on an interstate-commerce nexus. A Clause borrowed to help make citizens of the several States "one people" would be a strange instrument if it disappeared whenever the protected activity occurred inside one State.

Escrow work comfortably qualifies. The Supreme Court has described lawyers as playing an important part in "commercial intercourse."[46] Escrow officers likewise serve as neutral depositories for the funds and documents in real-estate transactions,[47] carrying out the parties' written instructions for closing.[48] And our court has recognized the enormous national significance of the residential housing market.[49] It can hardly be doubted that real estate transactions—and the professions that are indispensable to them, like escrow officers—are an important part of our nation's commercial intercourse.[50] A profession integral to transferring and financing real property is not at Article IV's periphery. It is a common calling at the core.

---

[44] 6 F. Cas. 546, 551 (C.C.E.D. Pa. 1823) (No. 3,230).

[45] *See id.* at 552 (explaining that the Clause protects a non-citizen's right "to institute and maintain actions of any kind in the courts of the state"); *Canadian N. Ry. Co. v. Eggen*, 252 U.S. 553, 560 (1920) (citing *Corfield*).

[46] *Piper*, 470 U.S. at 281 (quoting *Goldfarb v. Va. State Bar*, 421 U.S. 773, 788 (1975)).

[47] *TRW Title Ins. Co. v. Sec. Union Title Ins. Co.*, 153 F.3d 822, 824 (7th Cir. 1998).

[48] *Id.*

[49] *See Groome Res. Ltd., L.L.C. v. Par. of Jefferson*, 234 F.3d 192, 206 n.18 (5th Cir. 2000) ("The residential housing market in the United States is of tremendous economic significance to the national economy.").

[50] *Id.*

No. 25-20524

The State's premise also lacks record support. The State asserts that Texas closings are "purely intrastate," but it offered no evidence to that effect, and the district court found no such fact. Polk's uncontested affidavit suggests otherwise: his clients "require title and escrow services in multiple jurisdictions," and he derives "a substantial portion of [his] income from providing escrow, settlement, and related title services *nationwide*." A Texas closing is "purely intrastate" only in the sense *Piper* rejected.[51] And even taking the label at face value, it makes no difference. *Piper* protected the legal profession for its role in the national economy, not because any particular matter crossed a state line.[52] Escrow work likewise plays an integral role in the national real-estate market. The State's theory thus turns the Clause upside down: it invokes the local character of a Texas closing to justify excluding a citizen of another State from participating in it. That is the interstate discrimination Article IV polices.

\* \* \*

The Privileges and Immunities Clause protects nonresidents who seek to ply a trade, pursue an occupation, or follow a common calling within another State.[53] Escrow work "is sufficiently basic to the national economy to be deemed a privilege protected by the Clause."[54] Polk therefore satisfies the first step.

### b. Texas Has Not Shown a Substantial Justification

At the second step, Article IV permits unequal treatment only when a substantial reason exists apart from the mere fact of out-of-state

---

[51] *Piper*, 470 U.S. at 281.

[52] *Id.*

[53] *Hicklin*, 437 U.S. at 524.

[54] *Friedman*, 487 U.S. at 66.

11

No. 25-20524

citizenship.[55] Put differently, the State must show that nonresidents are a "peculiar source of the evil" the law addresses.[56]

The State also must show a close fit between the asserted interest and the discrimination. That inquiry considers whether the objective could be advanced through less discriminatory alternatives.[57] The Clause permits disparity in treatment only "where substantial reasons exist for the discrimination and the degree of discrimination bears a close relation to such reasons."[58]

Once facial discrimination against nonresidents in a protected calling is shown, the burden of justification belongs to the State.[59] At the preliminary-injunction stage, Texas therefore bore the burden of showing both a substantial reason for the discrimination and a close fit between the line drawn and that reason. It produced no evidence supporting either. It candidly acknowledges that it "did not offer evidence supporting the State's interest" below and proposes to supply that evidence "in later discovery." The State may develop the merits record on remand. But a present failure of proof cannot be answered with a promise of future proof. On the record before us, the State's conceded evidentiary silence matters.

---

[55] *See Toomer*, 334 U.S. at 396 (remarking that the Clause prohibits "discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States," but "does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it").

[56] *Id.* at 398.

[57] *Friedman*, 487 U.S. at 67.

[58] *Id.*

[59] *Toomer*, 334 U.S. at 398.

The State nevertheless offers three rationales in its brief. It says the requirement helps keep escrowed funds within Texas, facilitates enforcement against escrow officers in a multi-state region, and deserves deference because it has existed for nearly sixty years. On this record, none fits the law Texas defends.

Start with the asserted interest in keeping funds in Texas. The residency requirement is keyed to the *officer's* home address even though the asserted concern involves the location and security of escrowed *funds*. The rule also authorizes residents of four other States—Oklahoma, Arkansas, Louisiana, and New Mexico—to obtain licenses. If out-of-state residence itself endangered Texas funds, the statute embraces four States' worth of the supposed danger. Nonadjacent residents are not a "peculiar source" of that harm.

Enforcement fares no better. Every Texas licensee remains subject to Texas's appointment, bonding, disciplinary, and renewal requirements regardless of domicile. If physical proximity were the concern, the classification would track distance: Aztec, New Mexico lies about 280 miles from the Texas line, while Elkhart, Kansas is just forty miles away. The statute licenses Tulsa and refuses Wichita. It licenses Las Cruces and refuses Memphis. If intergovernmental cooperation were the concern, the line might track reciprocity, compacts, consent to service, or coordinated regulation. It tracks none of them. Its sole criterion is a shared border.

The record contains no evidence that contiguity improves service of process, access to records, detection of misconduct, or remediation of losses. The State has not explained why a shared border makes a licensee easier to reach. State boundaries identify jurisdictions, but they say little about proximity, amenability to process, or regulatory accountability. On this record, contiguity bears no demonstrated relationship to enforcement.

No. 25-20524

Longevity adds nothing to the State's justification. "A longstanding, widespread practice is not immune from constitutional scrutiny."[60] And the adjacent-state exception now before us dates to 2009, not the 1960s.[61] The State defends a sixty-year-old pedigree for a line that Texas drew seventeen years ago. History may illuminate constitutional meaning in some settings, but it cannot supply the substantial reason the State has not shown. On this record, the residency rule favors applicants from neighboring States simply because their States touch Texas. That geographic happenstance is not a substantial reason to treat otherwise identical applicants differently. It is the very interstate favoritism Article IV forbids.

\* \* \*

On the present record, escrow work is a protected common calling, and Texas has not shown that its residency requirement bears a close relation

---

[60] *Payton v. New York*, 445 U.S. 573, 600 (1980). Even if the residency rule could be deemed "longstanding," it is hardly "widespread." Other than the statute at issue here, the State (perhaps wisely) does not point to any other statute requiring state-line contiguity as a prerequisite to professional licensure.

[61] *See* Act of May 26, 2009, 81st Leg., R.S., ch. 155, § 1, 2009 Tex. Gen. Laws 489, 489 (codified at TEX. INS. CODE § 2652.051(c)(1)).

to any substantial interest. Polk is therefore likely to succeed on his Privileges and Immunities claim.[62]

### B. Irreparable Harm

Irreparable harm must be "more than speculative; there must be more than an unfounded fear on the part of the applicant."[63] The district court found this factor lacking solely because Polk "has brought similar cases in other states without requesting a preliminary injunction, thus suggesting slight, if any, perception of actual irreparable injury."

That reasoning applied the wrong inquiry. Irreparability turns on whether the injury can be remedied after final judgment. Polk's litigation choices in cases involving different laws, defendants, and procedural postures shed little light on that question. Because the district court relied on an "erroneous legal principle[]," our review is de novo.[64]

Sovereign immunity largely resolves the issue.

"An injury is 'irreparable' only if it cannot be undone through monetary remedies."[65] Sovereign immunity forecloses damages against Commissioner Crawford in her official capacity.[66] We have therefore treated

---

[62] Polk also argues that the regional residency requirement fails rational-basis review under the Equal Protection Clause. Because he is likely to succeed on his Privileges and Immunities claim, and because that claim supports the preliminary relief he seeks in full, we need not reach the equal protection question. We leave it, along with the merits, to the district court in the first instance.

[63] *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) (internal quotation marks and citations omitted).

[64] *See Opulent Life Church*, 697 F.3d at 288.

[65] *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B 1981) (quotation omitted).

[66] *Wallace v. Edwards*, 30 F.3d 1493, 1493 (5th Cir. 1994) (per curiam); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102–03 (1984) ("[W]hen a plaintiff

economic loss as irreparable when sovereign immunity leaves no damages remedy.[67] Every engagement Polk loses, every appointment he cannot take, and every client who turns elsewhere because he lacks the license represents a loss no later judgment can restore. This is conventional irreparable harm, not a doctrinal presumption.

The State calls Polk's affidavit "conclusory" and "self-serving." But the affidavit is evidence, and its assertions are specific. Discovery had not begun because the State had not answered. Polk's affidavit stood unrebutted; the State offered no counter-affidavit and sought no cross-examination or credibility finding. Polk swore that existing clients had "an immediate need" for his Texas services, that the rule had caused him "to lose business opportunities and associated revenue," and that those lost opportunities "cannot be recaptured at a later date" and diminish his goodwill, reputation, and competitive standing. The record therefore contains unrebutted sworn evidence of immediate and nonrecoupable losses. And the State cannot convert its own failure to rebut sworn evidence into an evidentiary deficit for Polk.

The State's reliance on *Celsis* does not alter the result. That patent case involved market dynamics requiring expert explanation, and the Federal Circuit credited expert testimony because the theory of harm demanded it.[68] No expert is needed to understand that excluding a professional from a licensed market costs him work in that market. Nor, before discovery, must

---

sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief.").

[67] *See Clarke v. CFTC*, 74 F.4th 627, 643 (5th Cir. 2023) (finding economic harm irreparable because sovereign immunity precluded money damages).

[68] *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012).

Polk identify every transaction he will lose. His specific, unrebutted affidavit adequately supports the point at this stage.

Polk's unrecoverable losses suffice. We therefore need not decide whether every likely Article IV violation independently constitutes irreparable harm.

\* \* \*

Polk's sworn evidence establishes far more than an "unfounded fear."[69] Each day the rule excludes him produces losses no later award can reimburse. The irreparable-harm factor favors preliminary relief.

## C. The Equities and the Public Interest

When the government is the opposing party, the balance of equities and the public interest merge.[70] The district court made no express finding on either factor. Its only relevant observation was that preliminary relief would be "precipitous" because the statute was old. But a party-specific preliminary injunction does not finally "overturn" a statute. It temporarily prevents the Commissioner from applying two provisions to Polk while the court resolves the merits.

The State correctly observes that enjoining a duly enacted law carries an institutional cost. But that interest cannot be dispositive in every constitutional case; otherwise, no state law could ever be preliminarily enjoined. Its weight depends on the plaintiff's likelihood of success, the scope of relief, and the concrete harm to the State. Here, Polk is likely to prevail, the injunction is limited to him, the rest of Texas's regulatory regime remains intact, and the State identified no concrete harm from evaluating him under

---

[69] *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

[70] *Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 780 (5th Cir. 2025).

the same substantive safeguards it applies to applicants from Texas and adjacent States. Polk, meanwhile, remains excluded from the licensed market and continues to suffer losses that sovereign immunity makes unrecoverable. On this record, the balance is not close, and it favors interim relief.

The public interest also favors relief because the challenged law is likely unconstitutional.[71] Injunctions vindicating constitutional rights are "always in the public interest."[72] Article IV in particular was designed to create a national economic union in which citizens of one State may pursue common callings in another State on equal terms.[73] The injunction leaves Texas's standards of competence, honesty, bonding, appointment, and accountability in place while directing the Commissioner to evaluate Polk without the challenged residency screen. The resulting relief respects both Texas's regulatory authority and Article IV's command of equal treatment.

## III. Conclusion

Texas may regulate escrow work rigorously. It may demand competence, experience, bonding, audits, discipline, and any other safeguard bearing on integrity and accountability. But Article IV requires the line to track the risk. Texas may not deem a Shreveport applicant trustworthy and a Chicago applicant untrustworthy merely because Louisiana touches Texas and Illinois does not. The State may screen for professional risk—but it may not use adjacency as a proxy for that risk.

---

[71] *See Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996).

[72] *Opulent Life Church*, 697 F.3d at 298 (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)).

[73] *Piper*, 470 U.S. at 281.

No. 25-20524

Polk is likely to succeed on his Privileges and Immunities claim. His continuing exclusion inflicts economic and reputational losses that no damages award can repair. And a narrow injunction therefore serves the equities and public interest while the district court resolves the merits.

Accordingly, we REVERSE the district court's denial of Polk's motion for a preliminary injunction and REMAND with instructions to ENTER a preliminary injunction prohibiting the Commissioner from enforcing Sections 2652.051(c)(1) and 2652.056(1) against Polk.